# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| UNITED STATES OF AMERICA | |
|---|---|
| VERSUS | CRIMINAL ACTION |
| DANIEL DAVIS | NO. 16-124-JWD-EWD |

## RULING AND ORDER

This matter comes before the Court on the Motion for New Trial in the Interest of Justice, Pursuant to Rule 33, Federal Rules of Criminal Procedure (Doc. 245) filed by Defendant Daniel Davis. The Government opposes the motion. (Doc. 265). On December 10, 2018, and March 8, 2019, the Court held evidentiary hearings on the motion. The parties submitted briefs in support of their respective positions following the December 10, 2018 hearing. (Docs. 264, 265, 273 & 274). After careful consideration of the parties' arguments, the facts in the record, and the applicable law, and for the following reasons, the defendant's motion (Doc. 245) is granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview

In November 2016, Defendant Daniel Davis was indicted and charged with two counts of deprivation of rights under color of law and four counts of obstruction of justice for allegedly assaulting an inmate twice at Louisiana State Penitentiary ("LSP") in Angola, Louisiana, and leading a conspiracy to cover up the assault. (Doc. 1). Davis was a supervisory correctional officer at the rank of Major at the time of the assault. In January 2018, Davis was convicted of four counts of obstruction of justice and acquitted of one count of deprivation of rights under color of law for the first alleged assault. The jury was unable to reach a verdict on the remaining deprivation-of-

rights count, and the Court declared a mistrial. The remaining count was ultimately set for retrial in November 2018.

On November 8, 2018, following a four-day jury trial, Davis was convicted of the one remaining count of deprivation of rights under color of law for the second alleged assault in an exterior breezeway. After the jury delivered its verdict, the Court held an informal discussion with jurors thanking them for their service. During this discussion, several members of the jury, including the foreperson, revealed that they were aware that Davis was involved in a prior trial and convicted of certain charges related to the offense he was ultimately convicted of in the instant trial. It is unknown how the information was revealed, as neither the Court nor the parties discussed it during the trial.[1] The next day, the Court held a telephonic status conference with counsel for Davis and the Government informing them of this discussion and soliciting feedback on the next steps to be taken. Subsequently, the parties and the Court agreed to hold a hearing during which each juror was individually questioned about his or her knowledge of Davis' prior trial and the discussion held with the Court following their verdict on November 8, 2018.

**B.**     **November 2018 Trial**

From November 5 to November 8, 2018, Davis stood trial on the charge in Count Two of the Indictment. Davis, along with codefendants John Sanders and James Savoy—both of whom previously pled guilty and agreed to cooperate with the Government—was accused of assaulting an inmate "on the exterior breezeway connecting the Shark units" at LSP while the inmate was restrained by handcuffs and shackles on January 4, 2014. (Doc. 1 at 2–3). At the trial, four correctional officers—Scotty Kennedy, John Sanders, Enrico George, and Patricia Seymore—

---

[1] In fact, both sides agreed to refrain from making any reference to a prior trial, and the Court adhered to this policy in its preliminary and final instructions to the jury. In those instructions, the Court directed the jurors—as it does during any trial—to refrain from conducting independent research or from considering any information not revealed during the course of the trial.

offered eyewitness accounts of the incident. Their testimony revealed that Davis "yanked" the inmate's shackles, causing him to fall face-first onto the ground in the breezeway.[2] According to testimony, Davis then proceeded to punch and stomp on the inmate and was joined by Sanders, a subordinate officer who interpreted Davis' action in yanking the shackles as a "green light" to assault the inmate. (Doc. 251 at 12–13). Savoy and Willy Thomas also participated in the assault. (*Id.* at 13). Throughout the alleged assault, the inmate was restrained and was not resisting. (*Id.* at 15). The assault left the inmate with serious injuries, including broken ribs, a dislocated shoulder, and a punctured lung.

The Court also heard testimony from Kennedy, Sanders, and George that Davis devised a cover story and instructed the three to report that the inmate had provoked the assault, that Davis merely assisted Kennedy in gaining control of the inmate, and that Sanders and Savoy were not present for or involved in the assault. (*See, e.g.*, Doc. 251 at 21–31). Davis did not testify at the November 2018 trial or provide his own theory of the case, but his portrayal of events was introduced through witnesses testimony and his attorneys' opening and closing statements.

**C.    Juror Testimony**

On December 10, 2018, 11 of the 12 deliberating jurors testified, in addition to one juror who was excused before the end of trial for personal reasons. The final deliberating juror appeared for questioning on March 8, 2019. The Court will summarize each juror's testimony, listing them in the order in which they testified on December 10 and March 8:

---

[2] As discussed, this was the second of two incidents between officers and the inmate, and occurred while officers were transporting the inmate from the location of the first alleged assault outside of the inmate's cell. (Doc. 251 at 11–12). During the first incident, Davis and Kennedy allegedly pinned the inmate against a wall outside of his cell while "kneeing" him. (*Id.* at 7–8). Sanders then joined and "struck him in the side of the head like three or four times." (*Id.* at 8). Officers placed a jumpsuit over the inmate's head after the first assault to prevent him from spitting because he had purportedly spit on Enrico George. (*Id.* at 10). The inmate did not resist or fight back. (*Id.* at 9–10).

**Juror 1**: Juror 1 recalled that, after the trial concluded and the Court issued its final instructions, while the jurors were eating lunch, the foreperson "casually" mentioned that Davis had a prior trial and conviction and that this was "the second go-round." (Doc. 260 at 4–5). He was unsure of what the previous conviction was for, but knew that a mistrial had been declared and that the current trial was a result of the mistrial. (*Id.* at 6). While there were other conversations between jurors occurring at this time, "several others" heard the foreperson's comment. (*Id.* at 5–6). However, the issue was not raised again during the jury's deliberations. (*Id.* at 7–8).

**Juror 2**: During lunch on the last day of trial after the jury was excused, Juror 2 heard the foreperson mention that the defendant was involved in a prior trial and that the current trial was "another part" of it. (*Id.* at 11). She did not remember hearing anything specific about the previous trial, and this was the only time it was discussed. (*Id.* at 9–11).

**Juror 3**: Juror 3 testified that "at least two people" mentioned something about a prior trial, but the only one he could identify was the foreperson. (*Id.* at 12). The foreperson stated that the defendant "was convicted along with the other guys" and that the current trial was for "a count that didn't go through." (*Id.* at 13). Juror 3 then stated to the others that they were "not supposed to talk about anything unless it was brought up in court," to which the foreperson responded that the issue of a prior trial was discussed in the courtroom during trial. (*Id.* at 13–14).

**Juror 4**: Did not hear anything about a prior trial until after the jury reached its verdict. (*Id.* at 16).

**Juror 5**: Juror 5 first heard about a prior trial while having lunch during the trial, when the foreperson commented that the defendant had been tried previously.[3] (*Id.* at 20–21). The foreperson did not provide any details concerning the previous trial or whether it "had anything

---

[3] Juror 5 is the only juror to testify that this conversation occurred during trial and not after the jury had been excused to deliberate.

do with [this] case." (*Id.* at 21). Juror 5 testified that the issue was mentioned only once. (*Id.* at 22).

**Juror 6**: While "deliberating after the trial," the foreperson "mentioned that there was a guilty verdict reached for falsifying paperwork and perhaps something else, perhaps one other charge, in a separate trial and this trial was being held because . . . no verdict was reached on this specific charge." (*Id.* at 24). Juror 7 assumed that "probably everybody" heard this comment, but noted that jurors were having "multiple conversations" at the same time and was "not certain" whether the entire jury heard the comment. (*Id.* at 25). This was the only time it was discussed during deliberations. (*Id.*).

**Juror 7**: Juror 7 testified that he did not learn about the previous trial until questioned by the Court. (*Id.* at 26).

**Juror 8**: "During deliberations," Juror 8 heard the foreperson say "something to the effect [that] another jury, they couldn't make up their mind when [the defendant] was on trial the first time" and that there was a "hung jury." (*Id.* at 28). Most jurors responded with some iteration of "What? We didn't hear that." (*Id.*). The foreperson speculated that it was revealed at the beginning of the trial, but stated that "he maybe had heard the lawyers talking about it . . . through opening statements or in the hallway or something." (*Id.* at 30). Juror 8 gained the impression that the foreperson "overheard" the reference to a prior trial in conversation, not during trial. (*Id.* at 31). Juror 8 believed that the entire jury heard the foreperson's comment. (*Id.* at 28).

**Juror 9**: Juror 9 was the foreperson. He stated that "after the verdict . . . a few of us just had asked like, 'does anyone remember hearing about this being like there had been a trial before?'" (*Id.* at 32). He believed that he heard about the previous trial during jury selection, but did not remember how or from whom. (*Id.* at 33). He stated that he thought he may have "heard

5

it like from the judge," but "wasn't sure" and speculated that he might have learned it from another member of the jury venire. (*Id.*). He stated that "it couldn't have been [from] the lawyers." (*Id.* at 38). He "could've sworn [the discussion of the previous trial] was after we had reached the verdict," but admitted that "it could have been like right before we had made it." (*Id.*). The majority of other jurors responded that they did not hear anything, and it was "just kind of left at that." (*Id.* at 39).

**Juror 10**: "During deliberations," foreperson made an "off-the-cuff" comment that "oh, by the way, [the defendant] was convicted . . . at other trials." (*Id.* at 41). Juror 10 thought that "quite a few" jurors heard the comment, and several replied that they had not heard anything about a prior trial. (*Id.*). The discussion then ended, and no details were shared regarding what occurred at the prior trial. (*Id.*).

**Juror 11**: Testified that he did not hear anything about a previous trial. (*Id.* at 43).

**Juror 12**: Juror 12 was released from his service prior to deliberations for personal reasons, and testified that he learned about the previous trial after he was released. (*Id.* at 46).

**Juror 13**: The alternate juror who replaced Juror 12 appeared on March 8, 2019, testifying that a juror (who was not the foreperson) stated that the defendant was involved in a previous trial. When she asked him if he had researched the issue, he said that he had. She testified that the juror who reveled this information and the foreperson became friends and were often joking during the discussions between jurors, which she viewed as inappropriate.

D.    **Conclusions from Jurors' Testimony**

While there are undoubtedly differences and inconsistencies among each juror's recollection of the events, the Court observed—and the parties agree—that when considering the testimony collectively, a narrative forms. The majority of jurors testified to a conversation that

occurred after the jury was excused to the jury room following the Court's final instructions. During lunch, and before they began formally deliberating, the foreperson stated to the group generally—and no one juror specifically—that the defendant had been involved in a prior trial arising out of the same facts and was convicted of at least some charges, but that the jury could not reach a verdict on another charge. The result was a mistrial and a new trial featuring the only charge on which the previous jury could not reach a verdict. Several jurors responded that they had not heard and were not aware of that information. In their post-verdict testimony, the jurors had varying accounts of the foreperson's specific comments and the details of the information itself.

All told, nine of the 13 jurors (including the foreperson) testified to having heard conversation about a prior trial. By the Court's count, at least six jurors testified to hearing a comment by the foreperson that the defendant was involved in a previous trial and that it was related to the instant trial. At least four jurors, not including the foreperson, testified that they were aware that the previous trial included a conviction of some sort. Seven of those nine testified to hearing that the prior trial was related to the current trial, while the remaining two did not specify whether they heard (or knew) the prior trial was related. Just four of the 13 jurors testified that they did not hear or learn anything about a prior trial before being released from service.

Seven of the nine jurors with knowledge of Davis' prior trial testified that the foreperson was the source of their knowledge. One of the remaining two, the foreperson, testified that a "few of us" asked, either after or "right before" the jury rendered its verdict, if anyone had heard that Davis was involved in a previous trial. The only juror to testify that the source of the extraneous information was not the foreperson was the alternate, who testified that another juror stated that

the defendant previously stood trial. She testified that she asked him if he conducted his own independent research on the issue, and he admitted that he had.

## II. DISCUSSION

Under Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Sixth Amendment guarantees all criminal defendants the right to a speedy and fair trial by an impartial jury, in addition to the right to confrontation. U.S. Const. amend. VI. "Put simply, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Virgil v. Dretke*, 446 F.3d 598, 605 (5th Cir. 2006) (internal quotation marks omitted). "The introduction of extraneous prejudicial information into the jury room violates a defendant's Sixth Amendment right to an impartial jury and his Sixth Amendment right to confrontation." *United States v. Mix*, 791 F.3d 603, 608 (5th Cir. 2015). While courts presume that juries are impartial, "the introduction of extrinsic evidence into the jury room requires a court to investigate the asserted impropriety." *United States v. Davis*, 393 F.3d 540, 549 (5th Cir. 2004). "Even one juror's prejudice is sufficient to warrant a new trial." *Mix*, 791 F.3d at 608; *see also Parker v. Gladden*, 385 U.S. 363, 366 (1966) (criminal defendant "was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors").

To determine if a defendant is entitled to a new trial based on the introduction of extraneous prejudicial information to the jury, the Fifth Circuit has developed a burden-shifting framework. First, the defendant must demonstrate "that the extrinsic influence likely caused prejudice." *Mix*, 791 F.3d at 608. The burden then shifts to the Government to prove a lack of prejudice "by showing there is no reasonable possibility that the jury's verdict was influenced by the extrinsic evidence." *Id.* (internal quotation marks omitted). To determine whether extrinsic evidence

8

"improperly influenced the jury, a district court must examine the content of the material, the way in which it was brought to the jury's attention, and the weight of the evidence against the defendant." *Davis*, 393 F.3d at 549.

## A. Likelihood of Prejudice

In *United States v. Mix*, the jurors informed counsel for the defendant in post-verdict discussions that the foreperson announced to the rest of the jury that she had been exposed to extrinsic evidence during the trial in a courthouse elevator. *Mix*, 791 F.3d at 607. The district court conducted a voir dire of the jurors. *Id.* at 606. The foreperson testified that she heard a man in the elevator state that the defendant "was not the only person who was being prosecuted" and that there were "going to be other trials" involving other defendants. *Id.* at 607. She denied revealing what she heard to her fellow jurors, and instead only informed them that "she overheard something." *Id.* The other jurors testified that the foreperson stated to them that the information "gave her comfort in voting guilty," but that they prevented her from revealing the content of the information. *Id.* The Government argued, like the Government here, that the information was "cumulative" and that "any problem was cured by the extensive jury instructions directing the jury to disregard extrinsic evidence." *Id.* at 608.

Here, the Court concludes that the defendant has met his burden of demonstrating that the extrinsic evidence likely caused prejudice. The Court finds this information to be objectively prejudicial based on the following factors: (1) the previous trial was related to the instant trial in that it arose out of the same facts; (2) the previous trial resulted in a conviction (which at least four jurors, in addition to the foreperson, testified they were aware of); and (3) the fact that the information was disseminated by the foreperson immediately after the jury was excused to deliberate, but right before formal deliberations began. All three factors make the extraneous

information revealed here substantially more prejudicial than the information in *Mix*. Indeed, knowledge that a criminal defendant has been convicted of a prior offense is so potentially prejudicial in and of itself that one of the Federal Rules of Evidence is devoted solely to its inadmissibility except in certain specifically-delineated exceptions. *See* Fed. R. Evid. 404(b). Here, potential for prejudice is significantly exacerbated by knowledge that the prior trial and convictions were directly related to the very offense for which the defendant stood trial. There is at least a possibility—and a strong one in the Court's view—that knowledge of this information tainted the defendant's presumption of innocence and altered the burden of proof at his trial.

Moreover, the fact that the information was (according to the majority of jurors) disseminated immediately after the jury was excused to begin its deliberations is particularly alarming. This means that, in all likelihood, at least a majority of jurors began deliberating with knowledge of a prior related trial. Such timing also disproportionately highlights and overinflates the importance of such information and its relevance to the jury's deliberations. The fact that the foreperson apparently told his fellow jurors this specific information at this particular time demonstrates that he considered it significant and relevant enough to discuss shortly after being excused to the jury room. The rest of the jurors, previously unaware of this information, may naturally have concluded that it was important and relevant to their verdict if it was being revealed at the commencement of their deliberations.

The Government advances a number of arguments challenging the prejudicial effect of the information. First, the Government argues that because the jury heard evidence at trial that Davis allegedly perpetuated a coverup, "it would be unreasonable to conclude that extrinsic exposure to the same information moved the needle in favor of conviction." (Doc. 265 at 11). But, based on their testimony, the jurors knew little—if any—details regarding precisely what Davis was charged

10

with and convicted of at the first trial. The extrinsic evidence at issue was not specifically that Davis was convicted of obstruction of justice for an alleged coverup. It is improbable that any juror would have enough knowledge of both the circumstances of the prior trial and the law itself to draw the conclusion that a previous trial included charges for the coverup about which the jury heard testimony in the current trial.

Moreover, the Government's argument is significantly undercut by testimony that several of the jurors were surprised to learn about the prior trial. For example, Juror 1 testified that "clearly there were several others besides myself [who] heard [the foreperson's comment] and asked for – – almost like a little surprised that that was reality in my opinion." (Doc. 260 at 5–6). Juror 8 testified that she was "very surprised" to hear the information about a mistrial and that other jurors commented that they did not hear it during trial. (*Id.* at 29). She explained that when the foreperson commented on the defendant's previous trial, "most of us said: What? We didn't hear that." (*Id.* at 28). Juror 3 testified that he was "taken aback" by the information because he had not heard anything about a previous trial. (*Id.* at 15). Juror 2 testified that when the previous trial was brought up, her "first thought was, how did I miss that? I didn't know that." (*Id.* at 9). No juror testified to knowledge of Davis' previous trial through trial testimony, nor that they assumed Davis had been previously tried based on the evidence introduced.

Nevertheless, even if they had possessed this specific knowledge, the information was still likely prejudicial because, as Davis points out in briefing, evidence of a coverup is not akin to being convicted for such conduct. If the nine jurors connected the dots and assumed, after exposure to the extrinsic information, that Davis had been previously convicted of the coverup about which they heard testimony, it would have become more likely, and not less likely, that those jurors would vote for a guilty verdict. Indeed, it would be a natural assumption that if Davis was

previously found guilty beyond a reasonable doubt for orchestrating and engaging in a coverup, he also committed the underlying offense. As in *Mix*, "the overheard information lent credence to the government's theory of the case." 791 F.3d at 609. Here, in the absence of the extraneous information, the jury was tasked with evaluating the credibility of the testimony concerning the coverup in addition to the testimony regarding the assault itself. That the jury in the previous trial acquitted Davis on one deprivation-of-rights count and deadlocked on the other does not change this calculus. The Court thus concludes that the extraneous information was not as cumulative as the Government urges.

Next, the Government asserts that the information regarding a prior trial was actually more prejudicial to the prosecution than to the defense, because the "natural inference" that a prior jury was unable to reach a verdict "is that there is reasonable doubt" of guilt. (Doc. 265 at 13–14). The Government's argument is logical, but it ignores the fact that not all of the jurors testified to having the same information, and several either (1) made no mention of a mistrial or (2) explicitly stated that they heard no details regarding the prior trial. Further, while the Court agrees with the Government that this information could have been somewhat harmful to its case, this does not eliminate the strong possibility that knowledge that another jury convicted the defendant of related crimes arising out of the same conduct at a prior trial is objectively prejudicial because it could make a juror more comfortable in voting for a guilty verdict in the subsequent trial. And there is no evidence that the information most prejudicial to the Government and beneficial to Davis—that he was acquitted of the other deprivation-of-rights charge—was ever revealed during the conversation in the jury room. Because there is no question that the "information that [the majority of the jury] received was just the kind of information that could affect a juror," Davis has met his

burden to demonstrate that the extrinsic information here was very likely prejudicial. *Mix*, 791 F.3d at 609.

## B. Possibility that Jury's Verdict was Influenced by Extrinsic Evidence

Having concluded that Davis met his burden to show that the information was prejudicial, the burden shifts to the Government to demonstrate a lack of prejudice by showing that there is "no reasonable possibility" that the jury's verdict was influenced by the extraneous information. For the following reasons, the Government has failed to meet this burden.

The Government urges that the Court's instruction not to consider any information beyond what was revealed during trial "mitigated any risk that the extrinsic evidence would influence the jury's verdict." (Doc. 265 at 14). But while the Court would like to believe its instructions carry such significant weight, it cannot accept the assertion that this specific instruction entirely cured any prejudice cased by the extraneous information revealed immediately prior to deliberations. It is clear that the information was learned at some point and then discussed in a group conversation in the jury room immediately after they were excused to begin deliberating. The Court's instructions did not prevent this conversation from occurring nor terminate the conversation even after Juror 3 referenced the instruction. In any event, the patently prejudicial nature of the information outweighs any curative effect the Court's prior instructions may have had.

The Government's argument is also contradicted by the Fifth Circuit's conclusions in *Mix*. There, the court held that the district court did not abuse its discretion in finding that the jury instructions were not sufficiently curative because the jury violated those instructions by "failing to bring the extrinsic evidence to the court's attention." *Mix*, 791 F.3d at 611. This was so despite the fact that, as already discussed, the remaining jurors in *Mix* did not learn the actual substance of the extrinsic information, and thus may not have felt compelled to voice any concerns with the

13

court. *Id.* Here, neither the foreperson (when he learned the information) nor any of the other jurors (after their lunchtime conversation during which the substance of the extrinsic information was shared) ever informed the Court that they had learned relevant extrinsic information. This is despite the fact that at least one juror testified he was concerned about the propriety of the extraneous information being discussed. (Doc. 260 at 13–14). The Court only learned of this fact during an innocuous conversation following the jury's verdict thanking them for their service. Identically, the *Mix* court observed that, "[a]t the very least, [the juror possessing the extrinsic information] failed to follow the instruction to report exposure to extrinsic information to the district court." 791 F.3d at 611. The foreperson here disregarded the Court's instructions by considering the information in the first place, sharing it with his fellow jurors, and failing to bring it to the attention of the Court.

The Government also argues that there "is no reasonable possibility that the extrinsic evidence influenced the jury's verdict because the evidence of the Defendant's guilt on the beating charge was overwhelming." (Doc. 265 at 8–9). The Court agrees with the Government that it introduced strong evidence of the defendant's guilt at the November 2018 trial through the uncontroverted testimony of several eyewitnesses. While Davis did not testify at trial, his theory of the case—introduced through the opening and closing statements of his counsel—was that the other officers involved in the assault were solely responsible and that he was not involved. The Government points to the Fifth Circuit's decisions in *United States v. Jobe* and *United States v. Ruggiero* to support its contention, while distinguishing *Mix* on weight-of-the-evidence issue. *Jobe* and *Ruggiero*, however, are not dispositive of the issues at hand.

In *Jobe*, only one juror learned that the defendant had been convicted of a prior crime similar to the charge for which he was on trial. *United States v. Jobe*, 101 F.3d 1046, 1058 (5th

14

Cir. 1996) (abrogated on unrelated grounds by *United States v. Ochoa-Gomez*, 777 F.3d 278, 285 (5th Cir. 2015)). The information itself was not as prejudicial as the information here, as it pertained to a prior unrelated conviction, and not a prior trial rising out of the exact same facts. Further, unlike the foreperson here, the juror in *Jobe* did not report the information to his fellow jurors. Thus, not only was the information exposed to only one juror (as opposed to nine here), but the simple fact that the juror felt the information unimportant enough to share with his fellow jurors suggests that he did not attach any particular significance to it. Conversely, the foreperson here felt the information was significant and relevant enough to share with his fellow jurors *immediately after* the jury was excused to begin deliberating.[4] Accordingly, the facts in *Jobe* are significantly distinguishable and objectively less prejudicial to the defendant than the facts at hand.

Similarly, the Government's reliance *Ruggeiro* is misplaced. There, a juror learned that the defendant had previously been disciplined at a job for fraudulent behavior. *United States v. Ruggiero*, 56 F.3d 647, 651 (5th Cir. 1995). She did not share the information with the rest of the jury. *Id.* at 653. Thus, as in *Jobe*, the information was both (1) not directly related to the facts of the trial and (2) only known to one juror. Here, the fact that the extrinsic evidence included that Davis was previously tried for the very same conduct and the information was known (in some form) to *nine* jurors is the primary reason the information was patently prejudicial to Davis.

In *Mix*, the Fifth Circuit concluded that the case was "not that one-sided" because the defendant presented believable evidence discrediting the Government's case. 791 F.3d at 613. The court found that if the jury believed the defendant's evidence, it likely would not have convicted him. *Id.* The Government is correct that the same is not true here. The defendant did not testify

---

[4] The Court also finds it significant that it was the foreperson himself who (according to the testimony of seven jurors) brought the information to the attention of his fellow jurors, given that the foreperson is specifically chosen by his fellow jurors for the position and acts as the leader of the jury.

and did not put on a case of his own. Instead, through counsel, he attempted to discredit the Government's case by exposing purported discrepancies in the eyewitness testimony. While the *Mix* court did not base its holding on the weight-of-the-evidence issue, instead finding that the Government had abandoned that argument, it still concluded that the Government had "failed to prove harmlessness." *Id.* Here, the Court reaches the same conclusion. Despite the strength of the Government's case, the Court cannot conclude that the extrinsic information was completely harmless if the eyewitness testimony were considered in a vacuum with no information regarding additional charges, a prior trial, and a conviction arising from the same general evidence.

The Court also finds problematic the Government's argument that the evidence of guilt was overwhelming because Davis "did not call a single witness to give an alternative account of the incident." (Doc. 265 at 8). Despite the strong evidence presented against him, it would be improper to fault Davis for not putting on a case of his own by denying his motion on this basis alone. Indeed, the Supreme Court has referred to the Fifth Amendment right against self-incrimination as "the mainstay of our adversary system of criminal justice," *Johnson v. New Jersey*, 384 U.S. 719, 729 (1966), and "one of the great landmarks in man's struggle to make himself civilized." *Ullmann v. United States*, 350 U.S. 422, 426 (1956). The danger of prejudice contained within the extraneous information itself is so high that the Court cannot conclude it is singularly outweighed by the strength of the Government's case against Davis.

Finally, the Government's argument that there is no evidence that the jury *actually* factored in the extraneous information into its decision, while technically correct, is ultimately unavailing. Neither the parties nor the Court have any information regarding the jurors' state of mind while deliberating because this information is expressly prohibited from exposure. Rule 606 of the Federal Rules of Evidence provides that a juror may not stestify to "the effect of anything on that

juror's or another juror's vote" or his or her "mental process concerning the verdict." Fed. R. Evid. 606(b)(1). The rule does, however, explicitly permit soliciting testimony regarding whether "extraneous prejudicial information was improperly brought to the jury's attention," but the Court and counsel for both parties fastidiously avoided wading into the jurors' mental processes and the effect the extraneous information may have had on their individual votes. *See, e.g.*, *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 680 (7th Cir. 2017) (courts should tailor Rule 606(b) inquiries to the question of whether a "communication [involving extrinsic information] took place and what exactly it said, to determine—without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussion—whether there is a reasonable possibility that the communication altered their verdict"). Thus, no direct evidence regarding the effect of the extraneous information on any individual juror's vote exists because the Court and the parties carefully avoided eliciting this information while questioning the jurors.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that pursuant to Federal Rule of Criminal Procedure 33 and in the interest of justice, the judgment should be vacated a new trial held. It is therefore **ORDERED** that Defendant Daniel Davis' Motion for New Trial in the Interest of Justice, Pursuant to Rule 33, Federal Rules of Criminal Procedure (Doc. 245) is **GRANTED**. It is further **ORDERED** that a telephonic status conference is set for **May 2, 2019,** at **9:00 a.m.** for the purpose of selecting a new trial date. Counsel for the United States is responsible for coordinating the call to the Court.

Signed in Baton Rouge, Louisiana, on <u>April 29, 2019</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**